Good morning, everyone. Before we begin, we are submitting on the briefs at this time two of the cases on this morning's docket, Musselman v. Mielheisen and Leonetti v. Bray. And with that, we'll begin our oral arguments with Hurry v. FINRA. HURRY V. FINRA Good morning, Your Honors, and may it please the Court. I wanted to start by speaking to the issue that was—the two issues that were raised in the Court's own order preceding oral argument relating to the Privacy Act and to the motion for summary judgment before getting to the rest of my argument. With respect to the Privacy Act issue, the Court raises a concern that there's been a waiver of the rebuttal by failure to respond to an argument regarding whether the release of records occurred with respect to natural persons. Now, this argument was responded to on—and that can be—the response can be found in the reply brief at Volume 4 of the Excerpts of Record, pages 849 to 52. The response was that the FINRA is partially correct. FINRA is correct that with respect to the corporate entity plaintiffs, they don't have any claim of action under the Privacy Act. However, the complaint does allege the release of records regarding national—natural persons. It does allege that FINRA accessed and released records of the hurry, and that hurries, and that can be found in the First Amendment complaint at Volume 5 of the Excerpts of Record, page 1229. The—we're here on a pleadings motion, so the issue is what's alleged. We did address it in our reply brief, so the point has not been waived. With respect to the motion for summary judgment issue that the Court raised, we reject the premise that the evidence that we have supplied is speculative. In fact, it's not speculative when you can make reasonable inferences or when a jury can make reasonable inferences from the evidence, and it's one that's supported by a viable legal theory, and that's the Barnes case at page 680. This is not speculative evidence because it's basically one of the most well-recognized theories in—in the law, which is that a party that acts guilty is guilty. In this case, FINRA has acted precisely like a party that leaked the information. The FINRA Commission obtained an ombudsman's report, but then did not allow the ombudsman to obtain any of the key evidence, did not allow the ombudsman to obtain the personal cell phones and e-mail accounts of FINRA employees who might have leaked the information. I guess the theory was that if they were going to leak information to a reporter, they must have been willing to do it from their official FINRA account where FINRA could access it. That they—that's a cover-up. That's not somebody who is trying to, in good faith, investigate the issue. And yet they had this ombudsman issue this report that said FINRA is all cleared, and they—they told the Hurries, FINRA's investigated this internally with our ombudsman, we're all clear. And this is despite—there's also evidence in the record that the SEC had actually stated that they thought FINRA was responsible for the leaks of information. But counsel, just so I can understand kind of how your theory works, I remember when I was in college, every once in a while someone would pull the fire alarm five minutes into a final exam. You never know who did it. This is at Cal Berkeley, so there's like 400 people taking the Econ 1 final. Could all of us be sued under your theory, and all of us be forced to go to trial because it's possible that one of the 400 of us in the exam pulled the fire alarm? No. No, Your Honor, because there isn't any issue there of any sort of collective cover-up. The cases that allow these sorts of— Collective what? I didn't hear you. Cover-up. Excuse me, Your Honor. Oh, I'm sorry. The cases that allow this sort of theory to go forward are cases like Summers v. Tyson and Ibarra v. Spangard. They involve smaller groups of people where there was some possibility that the people could collectively avoid responsibility by simply not identifying who it was who did it. That theory is much more applicable to FINRA than the issue of what would happen when you had 400 students in a student body who don't all talk to each other, don't all work for the same organization, et cetera. I would also add that there's other evidence that's not speculative in the motion for summary judgment issue. The fact that the FINRA witnesses who had made statements, clear statements, that leaks happened all the time at FINRA, and then they get up in their deposition and they simply deny that the statements mean what they clearly mean. You know, they may— Well, the fact that leaks happen all the time doesn't say anything about this specific situation to—I mean, that provides some credibility if there's evidence that specifically something happened in this instance, but why is it enough by itself to say, well, there are a lot of problems? It's like saying in a negligence case, well, I know this guy has run stop signs sometimes, but that doesn't mean it was done this time. I agree with the premise that merely making a statement that leaks happen all the time at FINRA would not necessarily evidence our case. However, in your stop sign hypothetical, if the defendant in that case had gone to lengths to actually deny that there were previous runnings of stop signs and to suppress evidence of previous runnings of stop signs, in that situation, maybe you would have a case. Why? It doesn't suggest anything about this instance. It only suggests lying about the other instances that aren't this one. I don't really understand how that supports, in an instance, that something bad happened this time. Well, Your Honor, I would say this is in conjunction with the other evidence we presented, but having said that, I do — I would disagree with that. I think that if somebody is sued and they make great lengths to cover up evidence — Well, to go back to my hypothetical, suppose you couple the denial that I've ever run stop signs before with an admission by someone else that, no, that was actually me that ran that stop sign, because that's really what happened here. There's someone else who says they were the source of this information. The problem with the Eric Miller argument, Your Honor, is that it doesn't account for all the information leaked. Specifically, there was an internal report that was leaked that only FINRA and the SEC had access to. Miller didn't have that. So somebody must have talked to the reporter other than Miller. But that gets back to the how do we know who it could have possibly been. Well, Your Honor, the question is, is that if a party goes to great lengths to cover that information up, what is the proper approach to this? Is it to simply say, well, you've successfully covered it up. I'm going to grant summary judgment for the defendant. Or is the proper approach to take it to the jury and allow the jury to decide whether it is credible, especially in light of, as I said, all the evidence we have here? It's not simply the matter of the testimony about the issue of leaks happening all the time. It's also the fact that you had the Ombudsman report, which was not talking about leaks in general. It was talking about these specific leaks, where they deliberately — did a half-hearted job and announced themselves clear. And it's also about the assertions of privilege in the Anderson deposition, where they asserted amazingly that the investigatory privilege applies to whether FINRA leaks information to the press, and whether FINRA leaked information regarding the hurries to the press, and wouldn't allow Mr. Anderson to answer any questions on that. So you have all sorts of evidence that, yes, it's circumstantial, but at some point it stops being the 400 kids in the high school and starts being, this is an organization that is trying to ensure that the evidence that might corroborate its wrongdoing in this case doesn't come out. And when that happens, I would argue it's a reasonable inference, not speculation, to say that's why they're doing this. Now, I want to move on to the other issues of the case. And with respect to the immunity issue, which is sort of the central issue with respect to this case, I just want to emphasize that this is a case about an agency. The police is a billion-dollar industry. It conducts searches and seizures to — in furtherance of that policing function. And yet it claims total immunity from any accountability for those searches and seizures. Yes, they say you can go ahead and appeal a FINRA decision on the merits to the SEC and perhaps get it reversed, or take it to the D.C. Circuit and get it reversed. But that doesn't remedy or create any deterrence value or anything with respect to conduct during searches and seizures. It doesn't stop them from doing anything. And this functional test that FINRA provides, where anything that's related to an investigation is covered by their immunity, really would mean that there are all sorts of absurd things that FINRA could do that would be arguably connected to investigation. For instance, they could come on one of these raids armed. They could destroy property. They could — they could prevent people from leaving and falsely imprison them. They could do anything. They could even possibly, if confronted, shoot somebody. And — But none of that is pleaded here. Basically, what you're complaining about are the methods by which the records were requested and processed under threat of, you know, regulatory enforcement. There's nobody shooting anybody or imprisoning anybody. So we're dealing with this complaint and not theory, right? Well, I agree, Your Honor. However, I would also say that theory is important. Indeed, the issue here is whether there's an immunity doctrine that covers all — Well, there is an immunity doctrine, right? I agree. Okay. The question is whether there's an immunity doctrine that covers investigation and therefore would categorically — Is it your position that there is — that the immunity doctrine doesn't apply at all to investigations in support of regulatory activity or potential regulatory activity? My position is that none of the cases that have granted FINRA immunity — and we can go through them — Austin, Barbara, D'Alessio, D.L. Capital, MMES, North, In re NYSC — Counsel, this was a yes or no question. Yes. My position is — Is it your position that there is no regulatory immunity for investigative activities that are in aid of the regulatory opportunity to go after someone within the scope of the regulatory — the agency's regulatory authority? My position is that there is no immunity for FINRA acting as investigator rather than prosecutor. And my position is supported by the Zanford case, which is really the only case out there that has ever confronted this. And it's also the same doctrine that prosecutors follow. It's — you know, it's not some horrible — parade of horribles that's going to result in all sorts of unwarranted liability to FINRA because it's the exact same rule that prosecutors follow. I see I have about two minutes left. May I reserve them for rebuttal? Certainly. You may do that. Good morning, Your Honors. May it please the Court, Greg Davis, on behalf of FINRA and Scott Anderson. FINRA argued for four and a half years that the Hurry's Privacy Act allegations failed to state a claim. And in response to those repeated arguments, the Hurry said precisely nothing. That silence constitutes waiver. It allows this Court to reject a claim on that alternative ground. The fact that the Hurry's decided to speak up now for the first time is of no consequence. This Court doesn't consider arguments that are raised for the first time on appeal, and it certainly doesn't raise arguments that were not presented to the trial court. Counsel said that they did respond to this argument in the district court and cited pages 849 to 52, if I wrote it down correctly, of the excerpts. What is your response to that? With respect to pages 849 through 852 of the excerpts of record, you'll note that's the second amended complaint. That's relevant here because the Privacy Act claim was dismissed with prejudice on the first amended complaint. Counsel also referenced, I believe, page 1229 of the first amended complaint. That's just, you know, a general allegation of their Privacy Act claims incorporating, by reference, all of the prior paragraphs of the complaint. At best, it contains a conclusory allegation of a Privacy Act disclosure, which neither the district court nor this Court need accept as true, pursuant to the Supreme Court's precedent in Ashcroft v. Iqbal. The reality is, neither in the district court and neither today have the Hurrys identified where in their 63-page, 355-paragraph complaint that they alleged an actionable disclosure, and they haven't identified it because they haven't alleged it. And furthermore, this Court will only consider arguments that have not been waived in exceptional circumstances. But there's nothing exceptional about what happened here. As Judge McEwen explained last year in G&G Productions v. Rusick, quote, a party's unexplained failure to raise an argument that was indisputably available below is perhaps the least exceptional circumstance warranting our exercise of this discretion. Your Honors can affirm the district court's dismissal of the Privacy Act claim as a result of the Hurrys waiver alone. You should also affirm that claim for the reason advanced by the district court, which is that FINRA is not an agency under the relevant statute. Well, we don't – I guess the further question is, if we conclude that the claim is waived, why would we go on from there? You need not, Your Honor. Certainly, if you conclude the claim is waived, then the dismissal is appropriate. You can dismiss for – excuse me, you can affirm for any reason supported by the record, and you should do that. If there are no further questions on the Privacy Act, I'll move on to the defamation and false light claims. So with respect to those claims, despite years of litigation, the production of 84,000 pages of documents, and the depositions of 13 witnesses, the Hurrys still can't make out the most basic features of a defamation or false light claim. Who at FINRA was the reporter's alleged source for the defamatory statement, and what did they say? And without those two essential facts, no reasonable jury could return a verdict for the Hurrys, and the district court was correct to grant summary judgment to FINRA. It's not just the absence, though, of those key facts that support summary judgment. It is also, as you mentioned, the overwhelming amount of affirmative evidence negating the Hurrys' claim and demonstrating that the reporter obtained his information from non-FINRA sources. You have the Hurrys' own employee, Eric Miller, admitting that he is the reporter's source. He is the, quote, person with knowledge of the investigation to whom the reporter attributed various statements. You have the fact that nearly all of the information in the three alleged defamatory articles was made publicly available by an SEC lawsuit that was filed months before those articles were published, which the reporter expressly referenced in his articles. You have the reporter's e-mail to FINRA, where he acknowledges, quote, you are certainly correct in that I did not learn about a probe tied to trading in Biozoom from FINRA. You have the reporter's further statements in each of the four articles that FINRA provided no comment to him. And then finally, you have the conclusion of FINRA's ombudsman. After performing an investigation, he concluded that, quote, there is no evidence that FINRA staff leaked information to the reporter. So FINRA met its burden of production. That shifted the burden to the Hurrys. And as the party that has the burden of proof at trial, the Hurrys had to come forward with significant probative evidence on each of the essential elements of their claim, including that FINRA published defamatory statements to the reporter. And they provided nothing. The only communications between the reporter and FINRA in the record is FINRA declining to comment and the reporter acknowledging that FINRA is not his source. The Hurrys likewise failed to provide significant probative evidence on the essential elements of vicarious liability and causation. I'll stop to talk about vicarious liability for a moment because the reliance on Summers v. Tice is totally misplaced in this case. Summers v. Tice is a res ipsa case. Res ipsa infers negligence from the nature of an action. It is not a substitute for vicarious liability. And here, if the Hurrys are trying to impose liability on FINRA and not liability on a specific FINRA employee, they must demonstrate that that employee made the alleged defamatory statement within the scope and course of their employment. They, of course, haven't done that and they can't because they can't identify any FINRA employee that made any statement and they certainly haven't identified the circumstances under which the statement was made. The Hurrys' principal arguments against summary judgment appear to be that FINRA purportedly gave the reporter truthful fraud surveillance reports and that FINRA employees lied about the scope of leaks or whether leaks occur at FINRA. Those arguments simply are not supported by the record. Nobody at the SEC testified that the SEC had excluded itself as the source of the fraud surveillance reports or that it concluded that FINRA had provided the fraud surveillance reports to the reporter. Indeed, in March 2017, after discovery even closed in this case, the SEC indicated that its investigation regarding whether the fraud surveillance reports originated from SEC was still ongoing. So there is no conclusion there. With respect to the ombudsman having a whitewashed investigation, there's simply no evidence in the record demonstrating that FINRA's ombudsman intended to hide rather than uncover whether FINRA was the reporter's source. Counsel, would you turn to the question of regulatory immunity and respond to the argument that investigation as an activity is outside the scope of regulatory immunity? Your Honor, that assertion is contrary to this Court's holding in SPARTA. It is contrary to this Court's holding in Partnership Exchange, and it is contrary to the holding of every circuit court of appeals that has addressed this issue since the Ninth Circuit came out with SPARTA Surgical v. NASD. It is clear from the case law that the regulatory, excuse me, that the absolute immunity of self-regulatory organization extends to regulatory functions. You don't have to look any further than SPARTA to reach that conclusion, because this Court in SPARTA made plain that the function for which the NASD was absolutely immune was a regulatory function. That's at page 1215 of the SPARTA opinion. The Court says — Was that — I'm trying to recall whether there was a specific discussion of the investigative part of the regulation — of the regulatory scheme. No, Your Honor. SPARTA related to the suspension of trading. Yeah. So, specifically with regard to investigative activities as distinct from prosecutorial activities, I think that's what opposing counsel is arguing, that there's a distinction that matters between those two. And it sounds like you agree that SPARTA really is about the prosecutorial piece, the decision to — No, Your Honor, and I apologize if I didn't make myself clear. This Court in SPARTA made plain that SPARTA was not about prosecutorial immunity. SPARTA was about regulatory immunity. Correct. But they — but it wasn't specifically in the context of the extent of an investigation, I guess, is — That's correct. Okay. SPARTA did not come up in the context of an 8210 investigation. Okay. That's what I'm trying to get at. I'm not being very articulate in my questions, but what is the authority closest to your position on that question? The authority closest — frankly, it's all of the cases that indicate that an SRO is absolutely immune for its regulatory function. And so the question ultimately becomes is — What is a regulatory function? Exactly. Exactly right, Your Honor. And nothing could more clearly be a regulatory function than the review of records of a third party. That's a function that a private company cannot take. And that's ultimately the line with SRO immunity. It's this distinction between whether it is a, you know, regulatory, prosecutorial, adjudicatory function taken under the aegis of the Exchange Act, or is the self-regulatory organization acting as a private company. And here the answer is easy, because no private company can compel another private entity to turn over documents. This is a quintessential regulatory function. Counsel also indicated that SRO immunity only extends to those facts covered by previous cases. No Ninth Circuit authority stands for that proposition. The Second Circuit in Batts-Global rejected it outright. There have been assertions in the briefing that there is a bad faith exception that has been plainly rejected by this Court. In Sparta, the Second Circuit agreed, explaining that no such exception exists precisely, quote, so that SROs will not be excessively timid in their regulatory decisions. And then with the limited time I have left, I'll address the last supposed exception that the Hurries indicated in their briefs, and that's that regulatory immunity somehow doesn't reach the claims by non-members. Again, Sparta is instructive on that point. The plaintiff in Sparta was not a member of the self-regulatory organization. D.L. Capital, In re NYSE specialist to Second Circuit cases, also instructive there. The plaintiffs were not self-regulatory organization members. In fact, In re NYSE specialist was a class action claim. So no court has drawn the exceptions to SRO immunity that the Hurries would ask you to draw. In fact, this Court in partnership exchange made it quite clear that Sparta admits of no exceptions. Absolute immunity must be absolute. As the Second Circuit correctly concluded in D.L. Capital, FINRA was not acting as a private business when it copied the computers in question, is a quintessential regulatory function, and the District Court was correct to find FINRA immune from those on-site examination claims. As we indicated in our briefs, the dismissal of the on-site examination claims can be affirmed for the additional reasons that there is no private right of action for FINRA for violation of its rules, which is exactly what this case is. It's alleging that FINRA violated Rule 8210 by performing a purportedly overbroad investigation. And likewise, all of the claims they've asserted, they fail for substantive reasons. They haven't been pleaded adequately. That's indicated at pages 36 through 43 of FINRA's briefs. Unless there are any further questions from the panel, I respectfully request that the District Court's orders be affirmed. No further questions. Thank you, Your Honors. Thank you. And you have some rebuttal time remaining. Thank you, Your Honor. Mr. Esper, would you start by addressing Mr. Davis's argument that you've waived your claim because you never raised them in the District Court? Well, Your Honor, I'm not sure that the Privacy Act issue was specifically raised in the briefing in the District Court. It was certainly pleaded. It was raised in this Court, of course, and it's a legal issue. But it may not have been. I did look through the brief while opposing counsel was speaking and with candor. I could not find it there. I want to address several things. First of all, with the thing that Mr. Davis said about the regulatory function, his definition of regulatory function was no private company could do what FINRA was doing here, investigating. Well, if that's the case, then they're a State actor. If that's what they're doing, if they're just doing something that no private company can do, ipso facto, they're a State actor. They deny it. We know that. But that's fundamentally the tension of this case. FINRA is the government when they want to be the government, and they're a private actor when they want to be a private actor, whichever theory allows them to escape liability. And all I'm urging this Court is there be one theory for FINRA. We know what FINRA is, and under this theory, certain claims may be precluded. Other claims may be able to get through. But there's one theory as to what FINRA is. It's not a hybrid animal. Second of all, the Sparta and Partnership Exchange cases, as Your Honors noted, did not involve this investigatory issue. The only case that's really tackled the issue of the investigatory liability of FINRA is Sanford, where the D.C. Circuit said that they were viable. A third point I'd like to make is that we're not making claims for rule violations of FINRA. We're making claims for tort claims. And therefore, this no private right of action for rule violations issue is not an issue here. And I see my time's concluded. So. Thank you, Counsel. The case just argued is submitted, and we appreciate helpful arguments from both of you.
judges: Tashima, Graber, Owens